May it please the Court, Your Honor. This is Michael Barry. I'm with the law firm of Grant and Eisenhoffer from Wilmington, Delaware. I'm representing the plaintiffs and appellants in this action, the Indiana Electrical Workers and two SEIU pension funds. I'd like to reserve three minutes for you both. Okay. And I do understand that it counts down. Okay. The decision of the District Court below was the product of multiple errors of law that each warrant reversal by the Court. First, in holding that the $21.4 million cash payment to Carly Fiorina when she was terminated as CEO was not severance as a matter of law, the Court not only misapplied the relevant terms of the plans that were in the record before her, he adopted inferences adverse to the plaintiffs and resolved factual issues, both of which are wholly inappropriate in the context of a motion to dismiss. Second, in rejecting plaintiff's derivative claims on the demand futility point, the Court misapplied Delaware law. Pre-suit demand in this case was excused under the second prong of Aronson, which permits the presumption of the applicability of the business judgment rule if the allegations in the complaint raise a reasonable doubt that the decision in question or the act in question was not otherwise the product of the valid exercise of business judgment. In this case, the allegations in the complaint demonstrated that the actions by the defendant, the $21.4 million payment, without shareholder approval, violated the severance policy, exceeded the amount that was permitted under the severance plan, and was not consistent with the description of the LTPC plan that the Court – that the company previously had provided to shareholders. The Court rejected that argument. The Court on the – by focusing on the ultravirus point, the Court said that, well, it's not ultravirus for the Court to do – for the company to do it, so therefore, it's not – it's not – it's not – it doesn't get you out of – I thought you argued ultravirus. I'm sorry. I thought the complaint was loaded with allegations of ultravirus. Oh, yeah. But there's a different – Well, what I'm saying is misinterpreted it. And there's – Well, how did you advocate it? We advocated it just like this. It's not – it's not that it's a question of whether or not it's ultravirus for the company, but it's ultravirus for the board of directors. It's not that it's unlawful. It's not that it's impossible to get done. The question on the business judgment rule and the question of the second prong of Aronson is whether or not the decision was properly within the scope of the decision-making authority of the board. And in that regard, that's what ultravirus means. It's not the ultravirus that the company doesn't have the authority to do it under the law or under the certificate of incorporation or something like that. That has nothing to do with it. That can provide a basis in some circumstances, but under this circumstance, under what I'm talking about here and what the second prong of Aronson deals with is whether or not the specific decision was within the board's authority to make. And what we're saying – But why wasn't the decision here within the board's authority to make? Well, the – well, first – well, for three reasons. First, that gets into the – there are three plans that are applicable. We have the severance policy, the severance plan, and the LTPC. The severance policy – And this all fell under the stock plan or whatever the stock – No, no. The severance policy did not fall under the stock plan. The severance policy was a policy that was adopted in response to a shareholder proposal that was introduced by SEIU and voted on over the objection of the shareholders and adopted by the shareholders. Okay. So the severance policy is separate. Right. And so what – so the severance policy says we hereby commit that we won't pay more than 2.99 times annual salary plus bonus to any terminated executives without shareholder approval. That's the severance policy. The court – they then – the board then adopts the severance plan under the 2000 stock plan, under the 30 business 2000 stock plan, to adopt a severance plan that conforms with that severance policy. And, for example, for the CEO, they say we're going to pay her 2.5 times annual salary plus bonus. That complies with the severance policy because it's lower than 2.5. Now, so what happens is they terminate Carlucci Arena, virtually the first termination – first, certainly the only high-profile termination the company's had since adopting the severance policy. And they pay her, in total, a little over $40 million. But what we're talking about here is the cash component of that, which is $21.4 million. Now, they say we paid $14 million under the severance plan and $7.4 million, I'm going to call, this LTPC payment. So the question is, you asked, why isn't that within the authority of the board? It's not within the authority of the board because under the severance policy – rather, the severance plan, sorry – that says we're going to – when they say we're going to pay you 2.5, it says that the severance plan says we're only going to pay you 2.5 and we'll deduct from that any other – any other cash severance benefits. And we'll – and so, therefore, that's – if the LTPC could have been viewed as severance, then that should have been deducted. But more importantly, and the crucial issue on the factual resolution that was made by the district court, is that although they said we'll only – we'll only pay her 2.5 or 2.99 costs, we'll exclude from that and we'll reserve the right to pay other payments so long as they're consistent with company practices. So the question as to whether or not they had authority to pay is whether or not what they did was consistent with company practices. Whether that – whether that LTPC payment was consistent with company practices. If it wasn't, if it wasn't, then the – then I don't care what they called it, it should have been deducted or it should have counted to the total cash compensation. What would count as consistent with company practices? Something that was consistent with the LTPC plan at the very least, as described to share – as described to the shareholders. Now, let's – let's – the court said, well, you haven't established what the company practices are. Well, first off, if there's any – if there's any – well, first off, they admitted at least twice that it was severance. The defendants admitted at least twice it was severance. That at the very least ought to be a factual question as to whether or not the LTPC could be considered a severance plan. They call it a discharge package here. But whether – I mean, apple, apple, whether or not they – whatever they call it isn't a determinative factor. But so that's the first thing. But the second thing is the – they said that for payments under the LTPC, any payments that are – that are banked before the expiration of this third year, that will be – that will be forfeited unless you're terminated for reasons such as death, disability and workforce reduction. Okay. Let's – and although they reserved the right to increase or decrease payments, that plan, as represented to shareholders, specifically said that the board cannot exercise such discretion to increase any payments to covered employees. Okay. So what's company practices? I would submit that's the company practice. And what – there's two things that happen here. First, the – if they exercise discretion, A, under the terms of the plan, they concede the existence of an extraordinary circumstance because that's the only way you have such – the ability to exercise such discretion. Is extraordinary circumstance defined anywhere? No. No, it's not. But it's extraordinary. Second, it's not – they're not allowed to increase or decrease – or increase for covered employees. Ms. Fiorina was a CEO when she was fired. That's a covered employee under the – under the – under the Internal Revenue Code. No. Doesn't that provision say you have to be CEO on the last day of the fiscal year? There's two issues on that. First, which fiscal year are you talking about? You did not make that argument as to which fiscal year we're talking about. Well, we did make the argument that she's a covered employee under the code, period. I understand that, but you did not make an argument in your papers to us that were – that which fiscal year is in question is an issue. You assumed that the fiscal year in question was the year during which she was fired. Your Honor, we – Is that right? You are correct. We did not argue in the papers which fiscal year was a relevant consideration. But what we did argue is she was a covered employee when she was fired. I understand. You made that argument. The defendants in the – in the trial court below in these – in these arguments argued that she had to be a covered employee as of October 31, 2005, which was after – after she was terminated in order to qualify as a covered employee. We point out in response to that, that even assuming they're correct, that doesn't mean that she's not a covered employee at the time because she's still one of the four highest paid employees, even if she's not employed as of October 31st. So even assuming – And how do you – how are we supposed to calculate her compensation to determine whether she was one of the four? Because in the year – in the fiscal year in which she's terminated, because she's terminated, she's not one of the four, correct? I'm sorry? In the fiscal year in which she is terminated, she is not one of the highest – one of the four highest compensated because she's canned before the year expires. So if we look at her money received only during that period – That's – that's incorrect. Okay, good. In that fiscal year, she actually received – she was the fourth – she was like the second highest paid employee because of the LDPC payment. But that begs the question as to whether that's part of the compensation. Yeah, well, it does beg the question, but the only thing that's excluded from the compensation under the IR – Internal Revenue Codes are long-term incentive plan payments and excluded from that definition are anything authorized under a stock plan. Here, they're arguing that the LDPC was under a stock plan, so it by definition can't be excluded from the Internal Revenue Code's definition of what is included for purposes of calculating the four highest paid employees. So that gets to that question. They can't have it both ways. So the – so going back to what's consistent with company practices, they say – well, the district court said that you haven't established that the payment of the LDPC was not consistent. Well, what have we established? We should establish that at the very least that in order to pay, they'd have to exercise discretion, even assuming if – even assuming she's not a covered employee, they'd only have to be – they'd only be able to exercise discretion in the existence of – of extraordinary circumstances. The second thing we know is three days after she was – after Ms. Fiorina was terminated, the company changed the description of the LDPC plan. While previously it applied to – the description said we're going to – there's forfeiture in the case of anything other than death, disability, or workforce reduction. Now they changed it and said now it's going to apply in only the case of voluntary terminations other than death, disability, and workforce reduction. So they've changed the description specifically to allow the – to not provide for forfeiture automatically in the case of involuntary terminations. Where was that description contained? That was in the proxy statement. That was filed three days after Ms. Fiorina was fired. So – so they've changed the description of that. So what's consistent for company practices? Well, it's changed all of a sudden in the days following Ms. Fiorina's – Ms. Fiorina's termination. Now, the third thing is – Now, let me – let me make sure I understand that argument. It changes such that after the change, it's pretty clear that she's not entitled to it, correct? No, actually, after the change, she – the automatic forfeiture wouldn't necessarily apply. I see. So it's – I got it. Right. Because now it's only involuntary terminations. But that's just – but that's just a description, right? Well, it's a – I mean, if you go to the plan, if you go to the text of the plan. We don't have the text of the plan. Nobody has the text of the plan. The text of the plan – what we have is a – is in the record and was provided was a form – a form description of a grant pursuant to the LTPC. And then we have the company's description of what the LTPC was in the various proxy statements. And now we have them changing the rules of the game after Ms. Fiorina's term. But didn't she – didn't she sign an agreement? Not for the LTPC. But if she did – But she signed a severance. She signed a severance agreement. She signed that agreement. Yes. She signed a severance agreement. And she waived her rights. She – yes. Now, but – but let me get to the third point, is the other way they get around the forfeiture, the automatic forfeiture, is they say under the 2000 stock plan I'm allowed to waive it. Well, okay, if they've now – first off, I have no evidence, and there's nothing in the record that suggests that they actually exercise discretion. There's nothing in the record that suggests that they exercise any ability under the 2000 stock plan to waive. But if they did, wouldn't the waiver of a – of a policy constitute a deviation from the standard practices? At the very least, there's a question – Let me ask you this. So they've got this chief executive officer that they've decided they no longer want as chief executive officer. They want to get rid of her. Yep. They want to bring in somebody new. Yep. They don't like this merger business after all. It didn't prove to be successful. So they want to get rid of her. Yep. And they work out an agreement with her, which, you know, we see what the agreement entails. We have that written agreement that she signs off on, and it's in the record. Why doesn't all of that just sort of reflect on their part? You know, they have some discretion as the executive – as the policymaking body of the board. Why can't they in that circumstance? You know, it just sounds like it's all very difficult and confusing, and how does all this fit together? And we want to get rid of her?  You don't want to claim that they were disinterested? Pardon? You don't want to claim that they were disinterested? No, I want to claim, for purposes of the appeal, and what we've been arguing is that the demands are skewed under the second prong of Aronson because the payment violates the severance plan, the severance policy, and it can't be consistent with the LDPC plan. So your argument is – your question is to – they've made a decision as to, this is what we need in order to pay Ms. Fiorina to go away, and this is what we think it's going to cost. They can't necessarily make that decision because their ability to do so is restricted by the severance plan and the severance policy. At the very least, they should be able to share how they're both. So with respect to the severance policy, for example, they're the board of directors. Why can't they say, we're not going to follow this severance plan, and we decided in this particular instance we're not going to do that. Can they do that? No. Why not? Because that wouldn't be a product of the valid exercise of business judgment. Standard versus Wang, London, that's not a – that – they might actually say – prevail on not being liable, but for purposes of bringing a derivative claim, I've successfully alleged that that doesn't necessarily get the presumption of the valid exercise of business judgment because the plan restricts their ability to do that. Now, what they should have done is to say, this is what we think we're going to need to do. Hey, shareholders, will you approve it? Because that's what I have to do. Or comply with the policy, comply with the plan, and don't pay in excess of the limits. Those are the choices. They chose instead to say, I don't care what it says. This is what I think I have to pay her. Done. And then the shareholders say, well, you promised me a vote. Oh, no, no, we really didn't because we really didn't mean that any of these restrictions would actually restrict anything. So that's the problem with the district court's analysis on the LTPC plan. Really quick so I can have some opportunity to rebut, I wanted to move on to the direct derivative point and the standard review point. First, with regard to the standard review on the demand for utility, where we're talking about whether or not something is properly subject to business judgment, that's not abuse of discretion. But if it were, the resolution to factual disputes would constitute an abuse of discretion. On the whether or not something is direct or derivative, that's clearly a question of law with the NOVA review. And here the Court erred as well. There's two aspects of the direct claim. First, the right to vote. Second, the right to cast a fully informed vote at the subsequent meetings and the prior and subsequent meetings. On the right to vote, under Tooley, there's two inquiries, who was injured and what the remedy would do. First, who was injured? Under the claimed right to vote, I was injured. The shareholders were injured. They deprived me of my right to vote. On the latter, the votes on the plans, I was injured. I was deprived of my opportunity to cast a fully informed vote on those plans. I was lied to. The company wasn't lied to. The shareholders were lied to. That's the central aspect of the shareholder franchise. Second, where would the remedy go? On the remedy for purposes of the ‑‑ I was deprived of the opportunity to cast a vote on the severance plan, the remedy is to the shareholders. Give me my vote. Put the $7.4 million into constructive trust and let me vote on it. That's a central aspect of what they're going here. My clients specifically were the ones that introduced that underlying proposal. On the latter, on the vote on the severance plans, on the stock option plans, the remedy also, what we're looking for, goes to the shareholders. I want to rescind those votes. Cancel those votes. You improperly reserved the shares on those votes. So as a result, cancel the votes, rescind them, none. Now, to the extent that they take it upon themselves and issued shares that never should have been reserved in the first place, then you've caused me financial harm by diluting my interest. And that, because I can quantify that, that also provides the basis for a direct claim and it's not a derivative claim unatuly. I'd like to reserve some time for rebuttal. Thank you very much. Okay. Thank you. May it please the Court, Stephen Schatz on behalf of nominal defendant HP, I will address the demand issues. My colleague, Mr. Dickey, will address the issues on the merits as well as the specifics of the proposals. And you're going to divide the time more or less as how much? Half-half? Hopefully 50-50. Okay. After four successive complaints, Judge White, in a well-reasoned decision, dismissed the action with prejudice, finding that the plaintiffs had failed to complete facts establishing demand futility. That is facts rebutting the presumption of good faith that attached this disinterested independent board. Plaintiff's counsel is correct. We're dealing with the second prong only of Aronson. And that burden, when there's a disinterested board, is a particularly steep hill to climb. While we would believe, and Mr. Dickey will set forth, why this board was correct, for demand purposes, you need not decide that. You need only to decide that this board acted within its good faith business judgment. And in connection with issues relating to executive compensation and severance, that falls within the sweet spot of what a board's discretion. Are there any specific cases that say that? Sure. Certainly the Steiner case. Certainly Disney. Certainly the Brehm case. Each of those cases stand for that proposition. I'm trying to understand the scope of the argument as distinct from your co-counsel. Are you prepared to argue as to whether or not the payment under the LTPC was proper, or is that for him? That is for him, Your Honor. I'm prepared to, but it is for him. Okay. And this is ‑‑ this falls within the sweet spot. Before I address the demand issue, I want to just briefly touch upon the continuous ownership issue. We're going to rely on our brief on that. But a number of district court decisions within this circuit have found that saying and arguing at all relevant times is insufficient. This is very sophisticated counsel. They've chosen not to allege it. We've repeatedly made that point. This court could independently dismiss on that basis. So let me turn to the demand issue. As I indicated, this is within the sweet spot of what a board of directors has to do. So how do they try to circumvent it? Well, if you look at the complaint, which you would think would be the operative document, they argue ultra vires. They cite it somewhere between 10 and 20 times. The problem they have ‑‑ He clarified his point. Actually, Your Honor, if I could. The problem they have is that the Delaware Supreme Court has defined ultra vires not to include, as he describes, exceeding managerial authority, but acts that are not subject or not ratifiable. You don't have to rely on me. That's the Michelson case. And I also urge the court to look at Harbor Financial, which calls ultra vires a vestige or a fisticial concept. So on appeal, they argue exceed managerial authority. But they do that to distract attention from the standard, whether this falls within the parameters of the business judgment rule, and they simply cannot. Why? First, even a good faith misinterpretation of a policy falls within the parameters of the business judgment rule. Each of the cases they cite either falls within a class of cases where on its face, clearly, unmistakably, the board of directors exceeds the confines of its authorities. Whatever one wants to say about this, these are complicated provisions. Judge White himself fastidiously reviewed the provisions and concluded that they were correct. And that on its face suggests that this was ‑‑ it doesn't fall within the category of that case. There's one thing about this. So this arises ‑‑ this is before us on a 12b-6. As well as 23.1. 23.1. But still, it was dismissed on the complaint. So we take all the allegations in the complaint as true, reasonable ones. We don't take everything. But basically, you take the well-pleaded allegations as true. Your Honor, I think with respect to the merits, that is correct. But with respect to 23.1, the law is clear that you only have to take inferences from particularized facts. And all you have to conclude is, again, not for demand purposes, not that they got it correctly, but they acted within the parameters of the business judgment. The point is that there's really nothing in the complaint that alleges ‑‑ I mean, your argument you're making would be nice for summary judgment where you would lay out what the board of directors were thinking, what had been presented to them, how they looked at these plans, severance plans, the policy and all that. And then you could get a good insight as to what was before the board. So we're here on a 12B6. The case was kicked out on the complaint. And what you're saying, you know, I mean, that argument, I guess I could make that argument just as you have, that this was all ‑‑ these were difficult rules. These were how they all fit together. Obviously, it was a close call. It's well within their discretion, within their business judgment. But it really isn't there. Two points, if I could. We're talking about whether demand should be made on the board. They purport to bring a claim on behalf of the company. The reason to take that position would vitiate the demand requirement because their appropriate remedy for a disinterested board was to bring this claim to the board to assess that. So by equating that with a standard on a motion to dismiss and say, well, it's summary judgment, you're essentially taking away from the board of directors the decision that lies with them whether to institute suit. But more importantly here, the issue is not whether they complied. The question is whether under the business judgment rule they have alleged any facts that support an inference that this was in bad faith. And every single case that they cite, every single case fits within the parameters of a clear, unmistakable, unambiguous violation or bad faith. And simply, even under Twombly, they allege no such facts. The Delaware Supreme Court in Wood v. Baum said that the mere fact that they approved a given transaction isn't sufficient to create an inference of some sort of culpable knowledge. So what is the void here? They say, well, not only do they approve it, but they exceeded the policy limits or the plan limits. A mere misinterpretation isn't sufficient. You say it's a mere misinterpretation. They allege, but they allege no facts that give rise to an inference. Well, why do they need to allege facts beyond what? I mean, they've got lots of facts in there. And then they look at, you know, what's a covered employee? I mean, it seems to me that we just have to look and see, for example, was she a covered employee? I don't know what else they need to allege. But let's take your hypothetical, Judge Fletcher. Let's say they misconstrued it. Where's the inference that this interest report acted in bad faith? By the way, when I say it's a hazard. Where is bad faith in that second prong? I read the second prong. It doesn't say bad faith. It's within the outside of the boundaries of the business judgment rule, which means on an informed basis in good faith in the best interest of the company. But I think you can be outside the business judgment rule if you're acting entirely in good faith and you are dumb as a post. This is saying you made a flagrant error. But it doesn't have to be in bad faith. If it were a flagrant error, it would fall within the category of the words of the Delaware Courts. The rare case that is so egregious on its face that it could not be an instance where it constitutes a good faith exercise in the business judgment rule, that's not this case. And by the way, the language that I'm referring to is the Landy case, the Ryan v. Gifford case. Each of those say that only if it's a knowing violation. One other point, if I can go back, is a point that you made, Judge Paez. The fact is that this is not a, no one is claiming that this is a violation of a stockholder approved plan. It's a violation of a policy adopted or policies adopted. Right. And that's significant both because the cases they cite fall within that category and because as a board policy, they have a right, as the GM Hughes case and the Perlikus case say, to rescind the policy if they want to do. If they have the right to rescind it, they certainly have a right to modify and interpret it in good faith. And that distinguishes this case. One final point with respect to direct versus derivative. They ignore two cases. Only when there's an appropriation of the minority's interest, whether it be economic or voting, does that constitute an action under the, under J.P. Morgan and the Feldman case. The detriment of their case is that we never had an intention to follow the policies. Those policies were enacted two years before her termination. It's irrational on its face. Yeah, you're eating into your co-counsel's time. Very much. Okay. Thank you. May it please the Court, Jonathan Dickey of Gibson, Dun & Crusher, representing the Hewlett-Packard Independent Director Defendants. I want to cover three points in my time. First of all, a comment or two about the standard of review and pleading standards. Second, I want to talk specifically about the Court's decision with respect to the alleged violations of the LTPC program. And lastly, the Court's decision with respect to the alleged violations of the severance policy and the severance plan. In a standard review, we kind of know. Can we start out with the LTPC? Certainly, Your Honor. My concern is why is, how should I deal with the covered employee question with respect to the four most highly compensated employees? That's, for me, the soft spot. Your Honor, I think it's an easy path through the tax statute and the governing regulations to answer Your Honor's question. Let me start with the basic concept, which even plaintiff's counsel has conceded. We start with the definition of covered employee under Section 162M. There's no dispute about that. This Court can decide what the law is, but 162 on its face provides for two kinds of covered employees. It's the CEO on the last day of the fiscal year. And I'm after the second one. And the four highest compensated individuals as, importantly, defined by the securities regulations. So then we go to Regulation SK. As the briefs clearly indicate, there's no dispute that that's where we go. Regulation SK. Regulation SK, as well as the governing treasury regulation, both define those four individuals as the highest compensated officers, once again, on the last day of the tax year. Now, why am I supposed to interpret it that way? It seems to me they make a perfectly sensible argument. Under your version of it, they have to be employed on the last day of the fiscal year, correct? To be covered employees in those two categories. So, in other words, I mean, and if the fiscal year is the fiscal year during which she is terminated, the only way she could ever be a covered employee under either of those two prongs is if she's fired on the last day of the fiscal year. That doesn't make any sense. That is, in fact, what the statute says. That is, in fact, what the IRS notice that subsequently amended the guidance on 162M said. It is governed by your employment on the last day of the fiscal year. That's not an argument. That's what the statute says. There's only one exception to that, Your Honor, which is the argument that I'll call it the Hail Mary argument that was advanced for the first time in the district court at oral argument on the last round of motions to dismiss. That is dwelling on that aspect of Reg SK that deals with the two highest compensated officers. Had they not been terminated? And their argument there, quite simply, is, well, if you counted Ms. Fiorina as one of those two highest compensated officers, you know, had she been employed, then maybe she'd be a covered employee. The problem with that argument is twofold. A, there are no facts alleged to demonstrate that her salary and bonus would make her one of those two highest paid individuals. And Judge White got it exactly right that the governing regulation speaks to only two forms of compensation, salary and bonus, not anything else. So on its face, the regulation doesn't allow plaintiffs to go there. Secondly. So assuming for a moment that she qualified, even though she was fired before the end of the fiscal year, do we still have to address whether she's one of the four highest paid people during that fiscal year? Again, regulation SK is the answer to that. It says that, too, is decided based upon the four highest compensated officers at the end of the fiscal year. My question to you is, well, what happens if we look not at her total compensation for the fiscal year, but rather at her pro rata compensation? What happens then? Is she one of the four? No, because we're going back to salary and bonus only. That's what the regulation defines as the trigger. And if we look at her salary and bonus and we extrapolate over the full fiscal year what she would have earned during that full fiscal year, is she not one of the four?  Because she wasn't employed in the last day of the fiscal year. No, no, no, no, sorry. Assuming that she qualifies, and assuming, I'm putting to one side that question as to whether or not she has to be employed on the last day of the year. Assuming that that is, that she is, for purposes of applying the second prong, the four highest paid, it only matters that she be employed during that fiscal year. I understand you object to that interpretation. I'm not asking you to concede. But assuming for the moment that if she's employed during that fiscal year, the question now, that satisfies whatever sort of last day thing we need. If we look at the salary, or if we look at the compensation that counts for purposes of a covered employee during that year, and if we extrapolate out over the full year what she earned during the part of the year that she actually was employed, would she have been one of the four? If the law said... There's a yes or a no to that. If the law said during, the answer would be yes. Okay. But that's not what I think the law says. That's not what the district court found. Well, the district court doesn't make any findings. The district court just... We're saying here it's a matter of law. She had read the same undisputed plan documents, concluded that there is, in fact, a highly plausible basis for the district court to conclude, and indeed for this court to conclude, that the decision to award LTPC payments to Ms. Fiorina were not inconsistent with the plan documents, and that she was not exempted somehow because of her alleged covered employee status. So to get there, to buttress what Mr. Schatz described as the exercise of business judgment, the court concluded that there is a rational basis in the plan documents. There's no fact-finding needed for that in the plan documents, which are undisputed to conclude that the board was entirely correct in not finding her to be a covered employee. Why? Because the tax code, the Treasury regulation, regulation SK, and the IRS notice thereunder all supported that conclusion. So with that, what happens... Basically, and the way it goes back to Mr. Schatz's arguments, I'm having trouble with the bifurcation in a way. What happens if we conclude that you're wrong? That is to say that we read the regulations and the statute differently, and the way we read it, she was, in fact, one of the four highest paid, and that she was a covered employee. But we say, you know, this is kind of complicated. A very respected, careful district judge read it the other way. Does that mean they're protected under the business judgment rule from the demand? Yes, Your Honor, and this is Mr. Schatz's point, with which I heartily concur. Boards are entitled under Delaware law to make mistakes. Boards are entitled to make mistakes and not be sued for money damages. Wood v. Baum, the Delaware Supreme Court decision from last year, makes it even a higher bar by saying that not only must plaintiffs allege particularized facts to overcome the demand requirement, but with respect to directors such as my clients, who are protected by section 102B7 of the Delaware general corporation law, they have to allege particularized facts that indicate the existence of a non-exculpated claim. That's a phrase that is fraught with meaning under Delaware law. It means that the pleading of facts has to demonstrate facts akin to fraudulent knowledge, intentional misconduct, bad faith, which the Delaware Supreme Court says in so many words is about the most difficult pleading burden known to man. So my time is up, Your Honor, if you have any other questions. Okay. Thank you very much. Mr. Berry, you've saved I think a minute and 15 seconds. Why don't we give you two and see what happens. Thank you, Your Honor. First, Mr. Schatz's argument about the business judgment rule is simply not Delaware law. He puts the proverbial bunny in the hat. He says that they're entitled to the protection of the business judgment rule because they acted in good faith. That's not the second prong of Aronson. They're entitled to the business judgment rule under the second prong of Aronson if their decision was otherwise the product of the business judgment rule. The fact that it's compensation-related, we acknowledge compensation- Let me ask you this way. The question I just asked to Mr. Dickey, assume for the moment that I conclude that, in fact, she is one of the highest paid, one of the four highest paid, basically on the rationale that I just gave. But assume that it's a close question. And we have District Judge White who's a very careful, very intelligent judge. He goes the other way and so on. Are they protected by the demand rule by the fact that this is a close question and reasonable minds can differ? No. Because? Because we've alleged that it didn't comply with the plan. They might be able to prove facts at trial to say that they're not- But this isn't a factual question. This is a straight law question. How do you read the reg? Well, first off, there's a question as to whether the reg applies. It says covered employee. The LDPC doesn't bring in the reg. It just brings in the statute. But that said, because even if there's reasonable minds can differ as to whether or not she's a covered employee, that doesn't talk about that. That only gives them the opportunity to increase for extraordinary circumstances or to waive. But that gets you past the question as to whether or not that's mistaken. Then you've got to go back to extraordinary circumstances. Is there a deviation from company practices? So the argument that it's in good faith is not the right argument. The argument is, the issue is, did they comply? And if there's a reasonable basis that I've said they didn't comply with the severance plan, with the voting severance plan, and the 21.4 didn't allow it, that's a legitimate argument. Okay. Second, the direct derivative. J.P. Morgan Feldman, those all start with the premise that the company paid too much for something. That's the issue. Got it. Thank you very much, Your Honor. Thank you. Thank all of you for very useful arguments. Indiana Electrical Workers Pension Trust Fund v. Dunn, submitted for decision. We're now in adjournment for the day. All rise. The court is adjourned.
judges: Hall, Fletcher W. , Paez